UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HOLLY GIERTZ-RICHARDSON,

       Plaintiff,

v.                                                                    Case No.  8:06-cv-1874-T-24 MAP

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

       Defendant.
_____/

## **O R D E R**

     This cause comes before the Court on the parties' cross-motions for summary judgment and responses thereto.  (Doc. Nos. 55, 56, 63 and 65.)

**I.**     **Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See id. (citation omitted).  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

**II.**    **Background**[1]

This action is governed by the Employee Retirement Income Security Act of 1974, 29

U.S.C. § 1001 *et seq*. ("ERISA").  Plaintiff Holly Giertz-Richardson ("Plaintiff") is challenging

Defendant Hartford Life and Accident Insurance Company's ("Defendant") decision to terminate

payment of long-term disability ("LTD") benefits to her.  (Doc. No. 1, ¶ 6.)  Plaintiff is a

participant, or beneficiary, of an ERISA welfare benefit plan funded by a group insurance policy

(the "Policy") issued by Defendant.  (Id. at ¶¶ 2-3.) The Policy gives Defendant "full discretion

and authority to determine eligibility for benefits and to construe and interpret all terms and

provisions" of the Policy.  (Doc. No. 1, Exh. A at 27.)

According to the Policy, LTD benefits are payable to a participant if: the participant

becomes disabled while insured under the policy; the participant remains disabled throughout

and beyond the elimination period; the participant is, and has been during the elimination period,

under the regular care of a physician; and the participant submits proof of loss satisfactory to

Defendant.  (Id. at 9.)  The Policy defines "disability" or "disabled" thusly:

> Disability or Disabled means that during the elimination period and for the next 24
> months you are prevented by:
> (1) accidental bodily injury;
> (2) sickness;
> (3) Mental Illness;
> (4) Substance Abuse; or
> (5) pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result
> your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability
> Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties
> of Any Occupation.

---

[1]The Court has construed the facts in the light most favorable to Plaintiff.

(Id. at 29.)  Eligibility for LTD benefits is conditioned on the participant providing Defendant

with satisfactory proof of disability.  (Id. at 23.)  Defendant may request proof of loss throughout

the participant's disability, and has the right to determine whether the proof of loss is

satisfactory.  (Id. at 23-24.)  Payment of LTD benefits stops when a participant is no longer

disabled, or when a participant fails to furnish proof of loss, when requested by Defendant.  (Id.

at 10.)

Plaintiff was employed by JM Family as a Vice President for JM&A Group World Omni

Financial ("JM&A").  (Doc. No. 63, ¶ 6.)  JM&A's written job description of Plaintiff's position

provided that Plaintiff:

> Plans, directs and coordinates specific short and long-term initiatives that support
> organizational and corporate growth and objectives.  Conceptualizes, recommends and
> develops new programs, strategies and approaches for the achievement of maximizing
> organizational performance and business success while linking business and people
> components.  Collaborates with President, General Manager and Sr. Management in
> establishing group, company or corporate-wide priority improvement, programs and/or
> initiatives.
>
> Maintains and constantly works towards supporting and improving the impact of the
> organization's and companies' overall effectiveness.  Establishes high performance
> standards for the company(s) that ensures "Increased Productivity" and "Service
> Excellence."  May seek out and assist in developing strong operational efficiencies and
> processes in various departments.  Maximizes and builds management and leadership
> effectiveness throughout the organization.
>
> Directs planning, research and development efforts in defining strategic goals, objectives
> and programs for the achievement of the company's growth and overall profitability.
> Directs and communicates results of studies to assess organization's performance against
> plans.
>
> Provides leadership and management direction to various operating units to ensure
> overall effectiveness.  May be responsible for the successful operation of a major
> group(s), division(s), company(s) or department(s).

(A.R. H-448.)[2]  Plaintiff was diagnosed with Multiple Sclerosis ("MS") in 1997, and continued

to work until June of 2000.  (A.R. H-472, H-154.)  On October 1, 2000, Plaintiff applied for

LTD benefits, claiming a disability due to MS.  (A.R. H-1219.)  Her claim was approved and

Defendant paid benefits to her from January 2001 through December 2004.

On June 10, 2002, Defendant informed Plaintiff that according to her group policy, in

order to be eligible for LTD benefits, she must meet a new definition of disability:

Totally Disabled means that:

1.      during the Elimination Period; and
2.      for the next 24 months,

you are prevented by Disability from doing all the material and substantial duties of your
own occupation on a full-time basis.  After that, and for as long as you remain Totally
Disabled, you are prevented by Disability from doing any occupation or work for which
you are, or could become, qualified by:

1.      training; or
2.      education; or
3.      experience.

(A.R. H-92.)  On October 25, 2002, Defendant approved Plaintiff's claim for LTD benefits,

finding that she met the policy's new definition of disability.  (A.R. H-87.)

In November of 2003, as part of Defendant's on-going evaluation of Plaintiff's eligibility

for benefits, Defendant requested updated information regarding Plaintiff's condition.  (A.R. H-

1018, H-1016.)  Defendant sent Plaintiff a claimant questionnaire for her to complete and return,

and an attending physician statement to be completed and returned by Dr. Brian Steingo, M.D.,

her primary treating physician.  (Id.)  Plaintiff returned both forms to Defendant within the

month.  (Id.)  In the claimant questionnaire, Plaintiff complained of dizziness, fogginess, muscle

---

[2]Citations to the Administrative Record (Doc. Nos. 57-58) are indicated with "A.R."
followed by the page number.

and nerve pain, muscle spasms, muscle cramping, fatigue, weakness, numbness, cognitive issues, and ongoing limitations with her right hand, leg, and arm.  (A.R. H-1298.)  Plaintiff also stated that she was sometimes able to take care of her pets and her house, and that she could not think clearly and was experiencing memory problems.  (Id.)

After receiving Dr. Steingo's attending physician statement, Defendant asked Dr. Steingo to provide it with Plaintiff's treatment records, an analysis of her remitting/relapsing MS, her current course of treatment, and her current functional status.  (A.R. H-1013.)  Dr. Steingo responded, stating that "[o]verall we are achieving fair control, but she is certainly not symptom free."  (A.R. H-1008.)

Dr. Steingo's treatment notes indicate that he first saw Plaintiff on October 27, 1998, and continues to be her treating neurologist.  (A.R. H-607.)  In each of Dr. Steingo's progress reports, he notes Plaintiff's subjective complaints, and then provides a very brief summary of his examination of her.  (A.R. H-553-56, H-558-559, H-562-65, H-567-68, H-570-73, H-575-78, H-582-83, H-585, H-600-08, H-1146-60, H-2014-15, H-2017.)  Dr. Steingo's progress reports indicate that Plaintiff continually complained of: fatigue; weakness in her arms and legs; pain, stiffness and numbness in her hands; memory loss; difficulty with organization; and headaches. (Id.)  Dr. Steingo's notes further indicate, from his examinations of Plaintiff, that Plaintiff was always cooperative, alert and oriented as to time, place, and person, and her speech was always clear.  (Id.)  His notes also seem to indicate a progressive weakening in Plaintiff's arms and hands.  (Id.)

After obtaining Plaintiff's medical records from Dr. Steingo, Defendant had an investigator conduct video surveillance of Plaintiff on January 23-25, 2004.  (A.R. H-716.)  The investigator furnished Defendant with the surveillance video and a written report of Plaintiff's

observed activities.  The following description of the activities documented in the video are

taken from the investigator's report (A.R. H-716-722):

a.　On January 23, 2004, no surveillance was conducted, as Plaintiff did not appear to

be home.

b.　On January 24, 2004, Plaintiff was observed walking two dogs, "holding a dog

leash in each hand . . . [Plaintiff] switches to hold both leashes in her right hand,

wiping her eye with her left hand," and then put one leash back into her left hand.

Plaintiff was seen bending down to pick up a dropped leash, and was "walk[ing]

normally, twisting and turning her body from side to side . . .."  The dog walk

lasted approximately 24 minutes.

c.　Also on January 24, 2004, Plaintiff was observed in her yard, "bend[ing] her

upper torso forward 90° and adjust[ing] a sprinkler head in the lawn with her right

hand, then stand[ing] upright and walk[ing] a short distance before bending

quickly to retrieve a red plastic bag with her right hand while briefly supporting

her weight on her right leg. [Plaintiff] walk[ed] to the street then back to the lawn,

bending at the waist and in both knees to grab an object and move quickly out of

sprinkler range."  Later in the day, Plaintiff was observed adjusting the sprinkler,

bending downward with her knees bent, and walking backwards.

d.　On January 25, 2004, Plaintiff is observed driving a Porsche Boxter, and exiting

the Porsche Boxter, "slid[ing] to the edge of driver's seat, pushing off with both

hands against the vehicle to exit and clos[ing] the driver's door with her right

hand."  Later, Plaintiff is observed getting into driver's side of the Porsche Boxter

without bracing herself against the vehicle, and then driving, "utilizing hand over

hand motions on the steering wheel and twists, turning her neck from side to side."

On July 23, 2004, Plaintiff was given an independent neuropsychological examination at Defendant's request.  (A.R. H-534.)  Dr. Wiley Mittenberg, Ph.D, a clinical neuropsychologist, reported that an "[o]bjective examination of the validity of the examinee's reported memory, concentration, and thinking difficulties indicated that she intentionally attempted to display impairment that was not present."  (A.R. H-547.)  Dr. Mittenberg also responded to specific questions posed by Defendant regarding Plaintiff's ability to function.  Defendant's questions and Dr. Mittenberg's responses were as follows:

*Question #1*: From a psychiatric/psychologic perspective only, please describe this person's psychological strengths and limitations in functioning, with particular attention to how these might impact functioning in the workplace.  Describe strengths/limitations in function from simple/routine/low stress activities to higher level psychological tasks.

*Answer*: There is no evidence in the medical record or the results of the current examination that the examinee has any reduction in her psychiatric/psychological functioning compared to her functioning before the diagnosis of MS. Although the patient reported cognitive difficulties to her neurologist, her treatment providers attempted no actual valid and objective assessment of cognitive functioning.  No limitations in emotional, intellectual, memory, concentration, or problem solving ability were identified that would impact functioning in the workplace.

*Question #2:* Please explain how the test date and your observations are consistent or inconsistent with the examinee's self report.

*Answer*: The examinee reported memory, concentration, and intellectual difficulties that are inconsistent with her observed behavior in that no such difficulties were observed. Her report is inconsistent with the test results that indicate her intentional production of difficulties in these areas.  Her test results are not consistent with the neuropsychological pattern produced by MS in that non-verbal intelligence is typically poorer than verbal intelligence, memory is typically more impaired than intelligence, and problem solving abilities sensitive to multiple sclerosis are typically more impaired than intelligence or memory.  These patterns were not present in the obtained test data.

(A.R. H-550-551.)

After obtaining Dr. Mittenberg's report, Defendant again had an investigator conduct

video surveillance of Plaintiff on August 21-24, 2004.  (A.R. H-723.)  The investigator furnished

Defendant with the surveillance video and a written report of Plaintiff's observed activities.  The

following description of the activities documented in the video are taken from the investigator's

report (A.R. H-723-729):

 a. On August 21, 2004, Plaintiff is observed mowing her lawn with a self-propelled lawnmower, and is then observed "using an electric leaf blower with both hands. She is showing good range of motion and appears to have an abundance of energy."

 b.  On August 22, 2004, no Plaintiff activity is observed by the investigator.

 c. On August 23, 2004, Plaintiff is observed walking two large dogs, "walk[ing] in a fluid manner without any orthopedic devices or wheelchair."

On October 20, 2004, Plaintiff was interviewed by a representative employed by

Defendant.  (A.R. H-1506.)  During the interview, Plaintiff stated that she was in some

discomfort and stiffness, and that she had problems with her memory and concentration.  (Id.)

As for Plaintiff's physical activities, Plaintiff stated that she engages in yard care and walking

her two dogs (one being a service dog) around her neighborhood, usually walking three to six

blocks at a time.  (Id.)  In regard to her physical limitations, Plaintiff stated that she could only

be active for short durations because she had minimal stamina and endurance.  (Id.)  Plaintiff

stated that her illness was getting progressively worse.  (Id.)  The interviewer noted that Plaintiff

walked normally, but with some caution, and was able to sit in one position for approximately

thirty to fifty minutes at a time.  (Id.)  He also noticed that she appeared to have no problems

with her short term memory and was able to keep good concentration and focus during the

interview.  (Id.)

As part of this ongoing evaluation of Plaintiff's eligibility for continuing benefits, Defendant arranged for an independent medical review by University Disability Consortium ("UDC"). (A.R. H-910.)  The review was performed by Dr. Randall King, a board-certified neurologist, who reviewed Plaintiff's medical records, Dr. Mittenberg's report, and consulted with Dr. Steingo by telephone. (A.R. H-519.)

On or about November 24, 2004, Dr. King spoke to Dr. Steingo about Plaintiff's condition. (A.R. H-531.)  Dr. Steingo stated that Plaintiff had relapsing-remitting MS, that she had normal brainstem function, normal visual function, normal bowel and bladder problems. (A.R. H-526.)  Dr. Steingo also stated that Plaintiff had a mildly impaired gait, and that she had sensory problems in the right hand greater than the left hand. (Id.)  Dr. Steingo summarized that Plaintiff was severely impaired by her cognition, fatigue, and pain. (Id.)  When Dr. King asked Dr. Steingo about Dr. Mittenberg's neuropsychological evaluation of Plaintiff, Dr. King stated that Dr. Steingo "went into a rage and talked about how preposterous they were and he could easily find any psychologist in South Florida who would demonstrate the actual impairment that [Plaintiff] had."  Dr. King surmised that Dr. Steingo's reaction was so extreme because he was an advocate for Plaintiff and was unwilling to look at the likelihood that she was malingering on the neuropsychological testing. (Id.)

After reviewing Plaintiff's medical records, Dr. Mitteberg's report, and speaking with Dr. Steingo, Dr. King issued his report, in which he concluded that Plaintiff "probably has relapsing-remitting multiple sclerosis with an Extended Disability Status Scale score below 3.0." (A.R. H-529.)  From the data contained in the neuropsychological evaluation by Dr. Mittenberg, Dr. King stated that "the testing done by Dr. Mittenberg displayed data that was strongly suggestive of an attempt to malinger. . . . Therefore, there is [sic] no cognitive deficits that were documented."

9

(A.R. H-527.)  Dr. King observed that during Dr. Steingo's numerous evaluations with Plaintiff, "he never documented any neuropsychological or mental status abnormalities.  He always stated that her mental status was normal, or intact, or she had orientation that was normal."  (Id.)  Because Dr. Steingo never documented any cognitive difficulties and because Plaintiff's neuropsychological testing demonstrated an attempt to malinger, Dr. King concluded that "it is doubtful that [Plaintiff's] cognitive complaints have any objective basis."  (Id.)  He further concluded that Plaintiff had no restrictions in the use of her upper extremities for repetitive hand use/keyboarding. (A.R. H-893.)

On December 17, 2004, Defendant conducted an Employability Analysis to determine if there were suitable occupations that Plaintiff was capable of performing.  (A.R. H-812-14.)  Defendant utilized the Occupational Access System, which is a computerized job matching system that cross-references an individual's capabilities and qualifications with 12,741 occupations classified by the U.S. Department of Labor's Dictionary of Occupational Titles.  (A.R. H-814.)  The examiner conducting the analysis reviewed both Dr. Mittenberg's and Dr. King's report in determining Plaintiff's physical capabilities and restrictions regarding employment.  (A.R. H-812.)  The Employability Analysis identified that Plaintiff was employable as a Vice President, in a sedentary position, earning a wage of $64.78 per hour.  (A.R. H-813.)

On January 2, 2005, Defendant informed Plaintiff that she was no longer eligible for continued benefits.  (A.R. H-800-11.)  Accordingly, benefit payments were discontinued effective December 29, 2004.  (Id.)

On August 5, 2005, Plaintiff appealed the decision to terminate her benefits.  (A.R. H-377-420.)  Plaintiff stated that she was appealing Defendant's decision, because due to her

suffering from "co-morbid conditions, including multiple sclerosis, extreme fatigue, memory loss, muscle spasms and pain, numbness, headaches, extreme vertigo, visual disturbances, dizziness, degenerative disc disease, pain in her right hand, cramps in her calves, weakness, sleep disturbances caused by spasticity, narcolepsy, shoulder pain, bladder incontinence, leg stiffness, ccognitive [sic] impairments, depression, bursitis, spondylosis at c5-c6, urinary infrequency, and decreased coordination in both upper extremities," she was still limited from performing the essential duties of her occupation or one or more essential duties of any occupation.  (Id.)  In connection with her appeal, Plaintiff submitted the following materials for Defendant's consideration:

a. Plaintiff's personal statement, in which she recounts her career, her battle with MS, and how MS has progressed since her diagnosis in 1997.  (A.R. H-422-47);

b. Two articles on the symptoms of MS, specifically, fatigue and pain.  (A.R. H-449-462.);

c. Letters of support from family and friends.  (A.R. H-730-32, H-739-54.)  These letters describe Plaintiff's former lifestyle and personality, how MS has affected her, her current state of health, and express outrage at the suggestion that Plaintiff is malingering.  (Id.);

d. Newspaper and magazine articles regarding Plaintiff's achievement during her career, and also regarding how MS has affected her career and her life.  (A.R. H-472-75, H-697-715.);

e. Records of Dr. Steingo, Plaintiff's treating neurologist.  Dr. Steingo also submitted a letter in support of Plaintiff's appeal.  (A.R. H-476-77.)  Dr. Steingo states that in Defendant's decision to terminate Plaintiff's benefits, adequate

consideration was not given to Plaintiff's level of fatigue, which is a "widely accepted and known disabling symptom of MS." (Id.);

f.      Report of Dr. Francis McCarthy, a neurologist to whom Dr. Steingo referred Plaintiff for an evaluation to assess her cognitive and emotional functioning, under conditions that would "lessen the effects of fatigue on her performance." (A.R. H-478-86.)  Dr. McCarthy noted that Plaintiff was alert and oriented as to time, place and person, and that she "maintained eye contact, and answered questions without hesitation. . . . Speech content was logical and goal directed." (A.R. H-482.)  Dr. McCathy concluded that Plaintiff's "slow processing speed, fluctuating attention, fatigue, pain, problems sleeping that further increases her fatigue, her inability to set a schedule, and not knowing from hour to hour how she will feel or function, indicate that not only is [Plaintiff] not able to perform the duties required in her former executive position, but she is also not capable of holding down any type of paying position."  (A.R. H-483.)  Dr. McCarthy also concluded that there was no evidence that Plaintiff was malingering, and that the results from Dr. Mittenberg's neuropsychological evaluation could be "explained by pain, fluctuating attention, anxiety, driving that distance in the morning, and extreme fatigue engendered not only by MS, but also because she does not sleep well the night before because she suffers from cramping at night."  (A.R. H-483-84.);

g.      June 27, 2005 vocational assessment report of Dr. Charles Kincaid, a licensed rehabilitation counselor with the Vocational Consulting Group, to whom Plaintiff was referred for vocational assessment and determinations as to whether or not, as

a result of functional impairments due to her MS, she had sustained vocational

impairment or work disability.  (A.R. H-488-518.)  Dr. Kincaid concluded that

Plaintiff's "impairments and the functional limitations that have resulted from

[MS] have, to a reasonable degree of vocational certainty, eliminated her access

to the competitive labor market and future vocational options. [Plaintiff's] earning

capacity is also eliminated."  (A.R. H-501.)

For a comprehensive review of Plaintiff's case, Defendant referred Plaintiff's appeal to

the UDC.  (A.R. H-365-66.)  On October 13, 2005, Dr. Robert Marks (of the UDC) submitted

his medical record review of Plaintiff to Defendant.  (A.R. H-326-31.)  Dr. Marks is a board-

certified neurologist and physical medicine and rehabilitation specialist.  (A.R. H-343.)  In

conducting his review, Dr. Marks looked at insurance notes, claimant's reports, investigative

surveillance reports, surveillance video, Dr. Steingo's records, Dr. McCarthy's report, Dr.

Mittenberg's report, and the reports of various imaging studies.  (Id.)  Dr. Marks concluded that

"[t]he available documentation indicated probable multiple sclerosis," and that his review reveals

that Plaintiff's abilities "far exceed those required of a sedentary [] working occupation."  (Id.)

He further concluded that Plaintiff's fatigue should be accommodated by providing brief

periodic rest breaks, and that Plaintiff could optimize her success upon her return to work by

learning to pace herself.  (Id.)

Also on October 13, 2005, Dr. Milton Jay submitted his neuropsychological record

review of Plaintiff to Defendant.  (A.R. H-332-41.)  Dr. Jay is a neurologist with the UDC.  (Id.)

In conducting his review, Dr. Jay conducted a comparative analysis of Dr. Mittenberg's report

and Dr. McCarthy's report.  (Id.)  Dr. Jay concluded that he saw substantial support for Dr.

Mittenberg's conclusion that Plaintiff was malingering.  (Id.)  He further concluded that he "did

not see from Dr. McCarthy's neuropsychological evaluation findings adequate plausible support that [Plaintiff] had cognitive difficulties sufficient to subvert her occupational capacity."  (Id.)

On October 19, 2005, Defendant denied Plaintiff's appeal and upheld the termination of benefits (A.R. H-342-45), stating that upon review of Plaintiff's appeal, Defendant "concludes that the weight of the information and medical opinions in our file, viewed as a whole, supports that [Plaintiff] is capable of performing full time sedentary work."  (Id.)  The present lawsuit followed.

## III.   Standard of Review for ERISA Claims

When a court reviews a denial of an ERISA-plan benefit, the court follows the following steps:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" ( *i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is " *de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is " *de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

14

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious

review to the decision to affirm or deny it.

Williams v. Bellsouth, 373 F.3d 1132, 1137-38 (11th Cir. 2004)(footnotes and citations omitted).

In plan interpretation cases, when there is a conflict of interest, the court employs a two-

step, burden-shifting approach:

(1) The claimant shows that the administrator of a discretion-vesting plan is conflicted.

(2) The administrator then proves that his plan interpretation was not tainted by

self-interest.

A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the

conflicting interest of the administrator at the expense of the claimant.  But, if the administrator

can demonstrate a routine practice or give other plausible justifications-such as benefitting the

interests of other beneficiaries-judicial deference to it may be granted, since [e]ven a conflicted

[administrator] should receive deference when [he] demonstrates that [he] is exercising

discretion among choices which reasonably may be considered to be in the interests of the

participants and beneficiaries.  Id. at 1138 (footnotes, quotation marks, and citations omitted).

However, even if "the administrator satisfies this burden, the claimant may still be

successful if he can show by other measures that the administrator's decision was arbitrary and

capricious."  HCA Health Services of Georgia, Inc. V. Employers Health Ins. Co., 240 F.3d 982,

995 (11th Cir. 2001)(citation omitted).  If the court finds that the administrator "fails to show that

its plan interpretation benefits the class of participants and beneficiaries, the claims

administrator's plan interpretation is not entitled to deference."  Id.

**IV.**      **Defendant's Motion for Summary Judgment**

15

Defendant moves for the entry of summary judgment in its favor and against Plaintiff on her claim.  Defendant argues that its decision to terminate Plaintiff's benefits was correct and that it should be upheld under the Court's initial *de novo* review of this case.  Plaintiff responds that Defendant's decision was wrong.  Specifically, Plaintiff argues that Defendant's decision was wrong because: (1) Defendant weighed the evidence incorrectly; (2) Defendant failed to address Plaintiff's severe MS fatigue; (3) Defendant misconstrued the disabling cognitive symptoms of MS; and (4) Defendant erroneously disregarded Dr. McCarthy's test results and opinion.  Accordingly, the Court will consider each argument in determining whether Defendant's decision was wrong.

## A.  Weighing of the Evidence

Plaintiff first argues that Defendant's decision was wrong because Defendant did not correctly weigh the evidence.  Specifically, that the evidence upon which Defendant relied in deciding to terminate Plaintiff's benefits (the video excerpts as well as the reports of Drs. Mittenberg, King, Marks, and Jay) was grossly inadequate, and that Defendant failed to give adequate credit to Dr. Steingo's reports and opinion.

The Court finds that Defendant did not improperly weigh the evidence.   Contrary to Plaintiff's assertion, "plan administrators are not required to give special deference to the opinions of treating physicians."  Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1358-59 (M.D. Fla. 2004)(citing Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)).  As explained by the Supreme Court in Black & Decker:

> Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

538 U.S. at 823-24.  Furthermore, "[i]t is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled." Hufford, 322 F. Supp. 2d at 1359 (citations omitted).

While Plaintiff's doctors believe that Plaintiff was unable to work, it was not wrong for Defendant to credit the opinions of the UDC doctors that reviewed Plaintiff's medical records over the opinions of Plaintiff's doctors.  See Helms v. General Dynamics Corp., 222 Fed. Appx. 821, 833 (11th Cir. 2007)(stating that if the administrator was dissatisfied with the evidence of disability that the participant provided, it could submit the participant's medical file for peer review and could discount the participant's doctor's opinion in favor of a contrary opinion produced by the peer review).

In the instant case, the opinions of the independent reviewing physicians all supported Defendant's decision to terminate Plaintiff's benefits.  Dr. King concluded that it was doubtful that Plaintiff's cognitive complaints had any objective basis, and that she had no restrictions on the use of her arms for repetitive hand use and keyboarding.  (A.R. H-527 and H-893.) Similarly, Dr. Marks concluded that Plaintiff's abilities far exceeded those required of a sedentary working job, and that Plaintiff's fatigue could be accommodated with brief periodic rest breaks.  (A.R. H-343.)  Additionally, Dr. Jay concluded that there was not adequate plausible support that Plaintiff had cognitive difficulties that would prevent her from working. (A.R. H-332-41.)  Accordingly, the Court finds that Defendant did not improperly weigh the evidence.

**B.   MS Fatigue**

Plaintiff next argues that Defendant fails to consider Plaintiff's severe MS fatigue and the effect such fatigue has on her ability to work, and again points to Dr. Steingo's reports as evidence of her fatigue.  The Court disagrees.  In Dr. Marks' opinion, he specifically accounted for Plaintiff's fatigue, and found that it could be accommodated by taking "brief periodic rest breaks . . . for relaxing, stretching, change of position, taking medications if needed, etc." (A.R. H-331.)  He also noted that Plaintiff could optimize her success upon returning to work by learning to pace herself, and pointed out that an occupational therapist could provide Plaintiff with training in energy conservation measures.  (Id.)  Again, the Defendant was not wrong because it credited Dr. Marks' assessment instead of Dr. Steingo's.  "It is entirely appropriate for an administrator to rely on written reports of consultants who have done paper reviews of a claimant's medical records, even if those reports rebut the opinion of the treating physicians asserting claimant is disabled."  Hufford, 322 F. Supp. 2d at 1359 (citations omitted).  Accordingly, the Court finds that Defendant appropriately considered Plaintiff's MS-related fatigue in deciding to discontinue her benefits.

### C.   Disabling Cognitive Symptoms

Plaintiff next argues that Defendant misconstrued the disabling cognitive symptoms of MS that Plaintiff was experiencing.  Again, Plaintiff contends that Defendant erred in not relying on Dr. Steingo's reports of Plaintiff's symptoms and cognitive decline, because according to Plaintiff, these reports were the only reliable source of information.  The Court rejects this argument.

While an administrator cannot automatically disregard subjective complaints, administrators are also not required to automatically give significant weight to all subjective complaints.  If administrators were required to accept all subjective complaints that a participant

18

reported to a doctor, long term disability benefits "would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical profession." <u>Hufford</u>, 322 F.Supp. 2d at 1356.

In this case, Defendant had good reason for not giving significant weight to Plaintiff's subjective complaints and also to Dr. Steingo's opinions based on those subjective complaints. Dr. Steingo's opinions were refuted by the reports of the independent reviewing physicians and the surveillance video. Additionally, Dr. Steingo's opinions regarding Plaintiff's cognitive decline were refuted by his own consistent observations that Plaintiff was alert and oriented as to time, place, and person, and her speech was always clear, as well as Dr. McCarthy's observations that Plaintiff was alert and oriented and had logical, goal-oriented speech. As such, Defendant found that Plaintiff's credibility, and, by extension, Dr. Steingo's opinions, were called into question. It was not wrong for Defendant to give less weight to the opinions of the doctors who found that Plaintiff could not work based on her subjective complaints of disabling cognitive symptoms.

### D.  Dr. McCarthy's Opinion

Plaintiff next argues that Defendant did not give requisite credit and weight to Dr. McCarthy's evaluation and report. Plaintiff contends that Dr. McCarthy's evaluation of Plaintiff was "the most extensive, most deliberate, most integral, and comprehensive testing of [Plaintiff's] cognitive function that exists and was performed in a manner that accounts the symptoms of MS that would distort the outcomes," and that for Defendant to accept the report of Dr. Mittenberg over that of Dr. McCarthy was wrong. The Court disagrees.

In considering Plaintiff's appeal, Defendant was presented two neuropsychological evaluations. Dr. Mittenberg's evaluation found that Plaintiff was malingering, and Dr. McCarthy's evaluation found that she was not. Malingering is "pretending or exaggerating an incapacity or illness so as to avoid duty of work." Smorto v. 3DI Technologies, Inc., 393 F. Supp. 2d 1304, 1307 n.5 (M.D. Fla. 2005). To resolve this discrepancy, Defendant had both evaluations analyzed by an independent consulting neuropsychologist, Dr. Jay. Dr. Jay found that Dr. Mittenberg's evaluation was "consistent with the usual expectations for a comprehensive neuropsychological evaluation of disability determination quality." (A.R. H-333.) After reviewing Dr. Mittenberg's total evaluation and report, Dr. Jay concluded that there was substantial support for Dr. Mittenberg's conclusions that Plaintiff was malingering. (A.R. H-334.) As for Dr. McCarthy's evaluation, Dr. Jay found that "the scope of the procedures that Dr. McCarthy utilized in [her] neuropsychological evaluation was not consistent with the usual expectations of a comprehensive neuropsychological evaluation of disability determination quality." (A.R. H-336.) After reviewing Dr. McCarthy's total evaluation and report, Dr. Jay found that there was not adequate plausible support for Dr. McCarthy's conclusion that Plaintiff had cognitive problems that were sufficient to impede her occupational capacity. (A.R. H-341.)

The Court finds Dr. Jay's independent analyses of both Dr. Mittenberg's and Dr. McCarthy's evaluations, and his conclusions based thereon, persuasive. Based on the comprehensive battery of tests that Dr. Mittenberg administered to Plaintiff in July 2004, Dr. Mittenberg and Dr. Jay agree that Plaintiff was malingering. Dr. Jay illustrates this finding by showing the illogical nature of Plaintiff's performance on certain neurological tests. (A.R. H-333-36.) Dr. Jay criticized the scope of Dr. McCarthy's exam – specifically, that the mood questionnaires given to Plaintiff were self-report measures instead of a more reliable

standardized objective psychiatric inventory.  (A.R. H-336.)  Dr. Jay also criticized the fact that

Dr. McCarthy neither identified nor provided any data from her "test of motivation," which Dr.

McCarthy relied upon when concluding that Plaintiff was not attempting to malinger.  (A.R. H-

337.)

 Dr. Jay undertook a detailed and extensive comparative analysis of Dr. Mittenberg's and

Dr. McCarthy's reports.  Therefore, the Court cannot conclude that Defendant was wrong to

ascribe weight to Dr. Jay's findings, and by doing so, give more credit Dr. Mittenberg's

evaluation of Plaintiff than Dr. McCarthy's evaluation.

**E.**   **Conclusion**

 While there is evidence that Plaintiff was diagnosed with multiple sclerosis, a "diagnosis

does not by itself establish disability."  Jordan v. Northrop Grumman Corp. Welfare Benefit

Plan, 370 F.3d 869, 880 (9th Cir. 2003).  This case does not turn on whether Plaintiff had

multiple sclerosis or suffered from pain, fatigue, and other cognitive symptoms/conditions; this

case turns on whether Plaintiff met her burden of showing that her pain, fatigue, and other

cognitive symptoms/conditions rendered her unable to perform her job as a vice president.  See

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 526 (1st Cir. 2005).  As explained above, this

Court concludes that Defendant was not wrong in finding Plaintiff did not meet her burden.

Accordingly, it is **ORDERED AND ADJUDGED** that:

 (1) Defendant's Motion for Summary Judgment (Doc. No. 55) is **GRANTED**;

 (2) Plaintiff's Motion for Summary Judgment (Doc. No. 56) is **DENIED**; and

(3)      The Clerk is instructed to enter judgment for Defendant and to close this case.

**DONE AND ORDERED** at Tampa, Florida this 7th day of March, 2008.

SUSAN C. BUCKLEW
United States District Judge

Copies to:

Counsel of Record